UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MICHAEL USAJ, ) | CASE NO.: 1:10CV468 |
| Plaintiff, ) | |
| ) | MAGISTRATE JUDGE |
| ) | GEORGE J. LIMBERT |
| v. ) | |
| ) | |
| COMMISSIONER OF SOCIAL ) | **MEMORANDUM OPINION & ORDER** |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Michael Usaj Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI.) The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in her May 20, 2009 decision in finding that Plaintiff was not disabled because his medically determinable impairments were not severe (Tr.10-11). The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

## I. PROCEDURAL HISTORY

Plaintiff, Michael Usaj, filed his application for DIB and SSI on September 12, 2006, alleging he became disabled on January 1, 2006, due to bipolar disorder and attention deficit hyperactivity disorder (ADHI) (Tr. 91-99). Plaintiff's application was denied initially and on reconsideration (Tr. 53-58, 63-70). Plaintiff requested a hearing before an ALJ, and on April 9, 2009, a hearing was held where Plaintiff appeared with counsel and testified. A medical expert and a vocational expert also appeared and testified.

On May 20, 2009, the ALJ issued her decision, finding Plaintiff not to be disabled (Tr.10-17). Plaintiff requested a review before the Appeals Council, and the Appeals Council denied Plaintiff's request for review (Tr. 1-4, 46-48). Therefore, Plaintiff has requested judicial review of the Commissioner's final decision pursuant to 42 U.S.C. Section 405(g) and 1383(c).

**II.    STATEMENTS OF FACTS**

Plaintiff was born on December 2, 1981, which made him 24 years old on the application date and 27 years old at the time of the hearing. Plaintiff has the equivalent of a high school education and no vocationally relevant past work experience (Tr. 27, 129-131, 136). He has worked approximately 50-60 jobs in his lifetime, including fast food, sales, server, stock, set up, game room attendant and grocery bagger (Tr.130,296, 370).

**III.    SUMMARY OF MEDICAL EVIDENCE**

Two years prior to his alleged disability onset date, in March 2004, consultative psychologist Mark A. Cohen, Psy.D., performed a consultative examination of Plaintiff, at the request of the state agency (Tr.294-301). Dr. Cohen diagnosed Plaintiff with ADHD with a combined type of disorder of written expression (Tr. 300). Dr. Cohen summarized that Plaintiff denied significant mood problems or depression and that his testing results showed that he was gregarious, active, and socially extroverted (Tr. 300). However, Dr. Cohen noted that Plaintiff had interpersonal difficulties, difficulty with social skills, and difficulty functioning in a structured work environment (Tr. 300). He also found that he dealt poorly with conflict and avoided responsibility (Tr. 300). Dr. Cohen found that although Plaintiff was a "very bright" individual, he did not believe Plaintiff would benefit from vocational services until he would see a psychiatrist and become better stabilized on medication (Tr. 301). Dr. Cohen also recommended drug testing due to his mother's concerns that he was abusing drugs (Tr. 295, 301). In any event, Dr. Cohen opined that Plaintiff would do best in an occupation where he did not have to interact significantly with other people as he had difficulty interacting with co-workers and supervisors (Tr. 301). Dr. Cohen further opined that Plaintiff should look for vocations that are primarily hands on and active, but not social in nature (Tr. 301).

In November 2004, Plaintiff was admitted for three weeks into the Laurelwood Hospital for a detoxification program for his marijuana and alcohol dependence (Tr. 203). He was noted as having a history of ADHD and a possible mood disorder (Tr. 203).

Six months after his alleged disability onset date, in June 2006, Plaintiff started seeing

psychiatrist Ruth S. Martin, M.D., at the Neighboring Mental Health Services (Tr. 309-12). At the initial psychiatric evaluation, Plaintiff reported that he had a bipolar disorder diagnosis, but that he had taken no medications since he was 19 years old (Tr. 309). He reported that he engaged in credit card fraud when he was 16 years old, thereafter got married so his wife could get her citizenship, but now had child support issues as they were no longer married (Tr. 309, 311-312). Upon mental status exam, his mood appeared depressed and constricted, but he had no impairments with his cognition, thought content, perception, or thought processes (Tr. 310-311). Dr. Martin assessed Plaintiff as having a Global Assessment of Functioning (GAF) scale score of 60, which was indicative of moderate symptoms (Tr. 311).

At his next office visit, in July 2006, Plaintiff reported that he was sleeping better and had decreased anger while taking the Depakote which Dr. Martin had prescribed (Tr. 317). He also reported that his car was repossessed since his last visit, but that his lawyer (paid by his mother) "gets him out of stuff" and he recognized that she would do this forever (Tr. 317). Dr. Martin assessed Plaintiff as having a GAF score between 65-70, which was in the range of having only some mild symptoms (Tr. 318).

In August and September 2006, Plaintiff reported to Dr. Martin that he was working at Taco Bell, in bartending school, living with his father, and was "doing well" (Tr. 313-314). Dr. Martin noted Plaintiff's reports that while on Depakote, his mood and anger were improved and his impulsiveness decreased (Tr. 315). In August 2006, Dr. Martin assessed Plaintiff as having a GAF score of 70, which was indicative of only some mild symptoms, and in September 2006, she assessed him as having a GAF score of 70-75, which was indicative of only mild or transient/slight symptoms (Tr. 314, 316).

In November 2006, psychologist Herschel Pickholtz, ED.D., performed a consultative psychological examination of Plaintiff, at the request of the state agency (Tr. 321-27). When asked what was preventing him from working, he stated that he could not hold down a job because he would get depressed at times (Tr. 232). However, he reported that he had been seeing a psychologist over the last six months and that, with medication, he was "doing a lot better" (Tr. 321-22). He also indicated that while he used to use marijuana and alcohol, etc., he reported that he had

-3-

been totally sober over the last six months (Tr. 322). He described his daily activities as watching television and using his computer to play games until 2:00 a.m.; he would then go to sleep some time between 2:00 a.m. and 6:00 a.m. (Tr. 322-23). He reported that he lived with his mother and visited with his friends two to three times a month, but that mostly he played video games or read on his computer/internet (Tr. 323). He reported that he did not need any ADHD medications as he felt pretty calm and relaxed (Tr. 323).

Upon mental status exam, Dr. Pickholtz observed that Plaintiff's mood was "a little bit" constricted and "a little bit" depressed, but his eye contact was good, and he showed no signs of anxiety (Tr. 323-24). Plaintiff, himself, reported that with his current medications and support, his overall levels of depression appeared to be mild (Tr. 324). Dr. Pickholtz agreed that Plaintiff's depression seemed to be mild at worst and that, since he stopped abusing drugs and started taking his prescribed medications, his overall functioning appeared fairly appropriate and he had "no difficulties" in terms of functioning appropriately (Tr. 325). Dr. Pickholtz diagnosed Plaintiff with a history of mixed polysubstance dependency, in remission; a history of ADHD, in remission (per Plaintiff's own reports); and mixed personality involving narcissistic, passive/aggressive and addictive personality features (Tr. 326). Dr. Pickholtz assessed Plaintiff as having a GAF scale score of around 70, which was indicative of only some mild symptoms (Tr. 326). Dr. Pickholtz opined that Plaintiff would at worst have only mild impairment with relating to co-workers; handling 8-hour work activities in terms of speed, consistency, and reliability, and in terms of performing low-skilled/unskilled work; and would at worst have low average abilities to handle 8-hour work activities in terms of thinking and using his memory (Tr. 326-27).

Also in November and December 2006, while Dr. Martin circled on her progress notes that Plaintiff was moderately ill, she again assessed him as having GAF scores of between 70-75 (Tr. 351, 353).

In January 2007, state agency reviewing psychologist Guy Melvin, PhD., reviewed Plaintiff's record and opined that Plaintiff did not have any severe mental impairments (Tr. 329, 341). Dr. Melvin relied heavily upon Dr. Picholtz's examination findings to make his non-severity assessment (Tr. 341). In April 2007, another state agency reviewing psychologist, Caroline Lewin, Ph.D.,

reviewed the record and concurred with Dr. Melvin's assessment that Plaintiff did not have any severe mental impairments (Tr. 355).

Dr. Martin assessed no change in her GAF scores, etc., at Plaintiff's January, February, March , and May 2007 office visits (Tr. 344-49, 358-59). Consistent with his good clinical findings, in May and June 2007, Plaintiff reported that he felt "good" on his current medication regimen (Tr. 358, 378). In July 2007, Plaintiff reported that his concentration was better with the 150 mg. Dosage of Wellbutrin (Tr. 376).

In October 2007, Plaintiff reported that he was nervous and anxious, explaining that he went to McDonald's (presumably for a job) and was 10 minutes late (Tr. 370). He also reported that he was not treated well at the job site and that he was currently living in a car (Tr. 370). Dr. Martin noted that Plaintiff had lied to her about his sobriety and she circled on her progress note that he was markedly ill, and assessed him as having a GAF score between 50-55, which was in the range of moderate to serious symptoms (Tr. 371).

At this same visit in October 2007, Dr. Martin completed a mental functional capacity assessment for the Ohio Department Job and Family Services (Tr. 361-62). Dr. Martin noted Plaintiff's diagnoses of bipolar disorder and personality disorder, NOS (Tr. 361). She opined that he was moderately limited in 11 job functioning areas and markedly limited in eight job functioning areas (Tr. 361-62).

One month later, in November 2007, Dr. Martin assessed Plaintiff as having better GAF scores, i.e., between 50-60 (Tr. 369). However, she also seemed to question whether Plaintiff was really homeless, as she placed a question mark next to his report that he was homeless (Tr. 369). In December 2007, Dr. Martin reported no change in his condition (Tr. 366-67).

In January 2008, Plaintiff reported that he had housing vouchers and that he was actively looking for work (Tr. 364). Dr. Martin upgraded her assessment of his level of illness; she noted that he was moderately ill (Tr. 365).

In March 2008, Plaintiff asked Dr. Martin for a letter stating that he could not work due to mental heath reasons (Tr. 388). The Commissioner's review of the record shows that Dr. Martin never provided such a letter. Also in March 2008, Plaintiff reported that he relapsed on a marijuana,

-5-

alcohol, and painkillers the week prior (Tr. 427). As such, he attended a 12-session counseling/therapy program through May 2008 to regain his sobriety (Tr. 408-33).

In May 2008, Dr. Martin noted that Plaintiff had not been truthful regarding his sobriety (Tr. 385). In July 2008, Dr. Martin noted no change in Plaintiff's condition (Tr. 392-93).

In August 2008, Plaintiff advised Dr. Martin that he had been denied social security benefits on three occasions and asked if she could complete his attorney's form (Tr.439). Dr. Martin agreed and completed the form Plaintiff gave her-a medical source statement regarding Plaintiff's mental capacity (Tr. 405-06, 439). Dr. Martin opined that Plaintiff had a fair ability to function in 19 areas and a poor or no ability to complete a normal workday/workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods (Tr. 405-06).

From August 2008 through at least February 2009, Plaintiff participated in a Community Housing program where apparently Plaintiff was provided vouchers for housing if he maintained employment with the support of a case manager (Tr. 441-508). His case manager would assist him with various problems; for example, at one point, Plaintiff complained to his case manager that a co-worker at McDonald's was looking up his personal information on the internet and sharing the information with other co-workers and, as such, he did not want to go back to this job (Tr. 496-97). The case manager intervened and took Plaintiff to speak with the store manager and general manager to discuss the situation; his employers were "very understanding" and assured Plaintiff that his private information was not improperly disclosed (Tr. 495).

In August 2009, Dr. Martin noted that Plaintiff denied being depressed (Tr. 573). She noted no changes in his condition, just as she noted one month prior (Tr. 573-76).

## IV. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to DIB and SSI. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity. *See, Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.  STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *See*, *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the Alj's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *See, Walters v. Commissioner of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997). Substantial evidence is more than a scintilla of evidence, but less

than a preponderance. *See, Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *See, Id.*; *Walters,* 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole. *See, Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

## VI. SUMMARY OF TESTIMONY

Plaintiff testified that he had been clean and sober for one year (Tr. 23-24). He reported that he had been a full-time student at his local community college, until two weeks prior, when he became overwhelmed by school and had failed a math class (Tr. 25). He indicated that he did not have trouble concentrating in class, but that he had problems doing the homework (Tr. 32). He testified that he had received a $6,000.00 grant to attend school and would not have to pay it back unless he failed one of his classes (Tr. 25). He also reported working two days a week, playing with his cat, and playing on his computer between 14-18 hours a day (Tr. 26). He explained that he would play video games on his computer via the Internet (Tr. 32).

He testified that he worked for a cleaning company and, prior to that, he worked for McDonald's but left because one of the employees was harassing him by "prying into his life," and when he told the managers, they started "saying things" about him so he just stopped going to the job (Tr. 26). He reported living on his own, with assistance from an agency that required him to pay a certain portion of his paycheck towards the rent and utilities (Tr. 28). He reported that he drove a car his mother had given him (Tr. 28).

Carolee Lesyk, Ph.D., the medical expert, summarized Plaintiff's treatment/evaluations record and noted that he had "awfully good" Global Assessment of Functioning (GAF) scores in the record (between 70-75) (Tr. 34-35). Dr. Lesyk testified that she found Plaintiff not credible (Tr. 39). She explained that she had "trouble" with this case because although Plaintiff made claims of difficulty with sustained concentration, the record showed that he had a history of being able to do a lot of sustained computer work and that if he was able to do it one area, she questioned why he could not do it another area (Tr. 36). Since his sustained ability to play computer games required sustained concentration, she felt there was a volitional aspect with his behavior (Tr. 36). Along those

same lines, with regards to his recent schooling, she indicated that she was surprised any school would grant him a scholarship if he was not able to achieve anything (Tr. 36).

When the ALJ asked her if she had an opinion on what, if any, his severe impairments were, Dr. Lesyk indicated that she did not have an opinion except to say that he was "just enough compliant" to avoid getting thrown out of things, i.e., school, etc. (Tr.37). She went on to say that he seemed to have everyone well-trained to support him and that others were rising to the occasion to help him, which suggested personality features, but he was also " conveniently forgetful: enough to not take his medications to keep his symptoms level at a not very good level (Tr. 37). She advised the ALJ that if she did decide to grant this case, she hoped the ALJ would have an institutional payee and very frequent continuing disability reviews, explaining that there was a lot of "funny business" with money on his part and "how effectively he works the system" (Tr. 37-38). She went on that he seemed to be very good at working the system and had volitional and manipulative qualities (Tr. 38-39). She also noted that Plaintiff lied on more than one occasion to his treating psychiatrist, Dr. Martin (Tr. 38).

The ALJ then asked Dr. Lesyk if there was sufficient medical evidence to support a diagnosis of bipolar disorder or just personality disorder (Tr. 39). Dr. Lesyk opined that her review of the record showed that Plaintiff would only have a personality disorder, and not bipolar disorder (Tr. 39-40).

Finally, Ms. Kathleen Reis, the vocational expert testified. Based upon the hypothetical she found plaintiff to be disabled (Tr. 44). However, the ALJ no longer felt the restrictions she incorporated into the hypothetical were accurate when she rendered her opinion, hence she rejected the vocational expert's opinion. In addition, since she made a step two finding, no vocational expert testimony is required. The ALJ need not go beyond step two and inquire about vocational factors when determining disability.

**VII.    ANALYSIS**

Plaintiff asserts two assignments of error:

I.    WHETHER THE ALJ COMMITTED SUBSTANTIAL ERROR BY FAILING TO

PROPERLY EVALUATE PLAINTIFF'S MEDICALLY DETERMINABLE IMPAIRMENTS

II.   WHETHER THE ALJ IMPERMISSIBLY ACTED BEYOND HER SCOPE AS A FINDER OF FACT

The issue before this Court is the ALJ's step two finding that Plaintiff's medically determinable impairments of personality disorder and substance abuse (in remission for one year) were not "severe" impairments because they did not significantly limit his ability to perform basic work activities and that, therefore, Plaintiff was not disabled (Tr. 10-17).

Under the Social Security Administration's regulations, an impairment or combination of impairments is "severe" if it significantly limits a claimant's physical or mental ability to perform basic work activities for at least twelve consecutive months. *See* 20 C.F.R. Sections 404.1520©, 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your ability to do basic work activities."); Social Security Ruling (SSR) 96-3p available at: http://www.ssa.gov/OP_Home/rulings/di/01/SSR96-03-di-01.html. Where there is only a minimal effect on a claimant's physical or mental ability to perform basic work activities due to a slight abnormality or a combination of slight abnormalities, an impairment or combination of impairments is found not severe, and a finding of not disabled is appropriate at step two of the sequential evaluation. *See Higgs v. Bowen*, 880F.2d 860, 862-63 (6th Cir. 1988); SSR 96-3p. The evidence of record constitutes substantial evidence in support of the ALJ's decision that Plaintiff's conditions were not severe impairments as they only produced slight abnormalities which would have a minimal effect on his ability to perform basic work activities.

Here, Plaintiff argues that the ALJ ignored the medical source opinions and evaluated on her own all the evidence to determine that Plaintiff did not have any severe impairments. *See* Plaintiff's Brief at 9-14. However, the medical expert never opined that Plaintiff had a severe impairment. Id. At 10, 14. The medical expert explicitly declined to state that Plaintiff had any severe impairments (Tr.37), and instead opined that the medical evidence was sufficient to only support a diagnosis of personality disorder (Tr. 39). Also contrary to Plaintiff's assertions, the medical expert did not state that Plaintiff could not work due to his personality disorder. Plaintiff's

-10-

brief at 10.  Rather, the medical expert repeatedly posed the question that if Plaintiff could sit at a computer screen for extended periods, why could he not sustain and perform other work (Tr. 35-36, 39).

Thereafter, Plaintiff alleges that the ALJ took the medical expert's testimony out of context and left out relevant portions of her testimony.  Plaintiff's Brief at 10.  However, the medical expert has been clear in her testimony: she felt that Plaintiff was not credible (Tr. 39).  In fact, she stated, "I don't find him credible as I read the records" (Tr. 39).  She explained that she felt his behavior was volitional and manipulative, citing his ability to sustain concentration for extended hours on activities he wanted to perform (i.e., play computer games), which is why she posed the question of why couldn't he sustain such concentration in another area (Tr. 36).  In fact, in his disability paperwork, Plaintiff, himself, admitted that he was "not motivated to work" (Tr. 129).  Upon questioning by the ALJ, the medical expert did state that volitional and manipulative characteristics could be part of the disorder.  Therefore, she found him not credible, citing that he lied to his treating psychiatrist Dr. Martin on more than one occasion (Tr. 38-39).  She also testified that he was "just enough compliant" to avoid getting thrown out of things, i.e., school, etc., and that he seemed to have everyone well trained to support him but he was also "conveniently forgetful" enough to not take his medications to keep his symptoms level at a not very good level (Tr. 37).  She also advised the judge that there was a lot of "funny business" with money on his part and "how effectively he works the system" (Tr. 37-38).  Hence, as the ALJ noted in her decision, Plaintiff, himself, advised Dr. Martin that he had a lawyer who 'gets him out of stuff' and that his mother paid for the lawyer, which Plaintiff expected his mother would do "forever" (Tr. 14, 317).

The ALJ also did not credit Dr. Martin's October 2007 assessment that Plaintiff had several marked limitations in functioning (Tr. 14, 361-62).  As the ALJ indicated, Dr. Martin made this assessment when Plaintiff lied to her about his drug and alcohol use (Tr. 14, 371).  Thus, the ALJ correctly did not credit Dr. Martin's assessment as it was based on an untruthful history from Plaintiff (Tr. 14). Dr. Martin's one-time assessment of Plaintiff as having marked mental limitations was in contrast to her progress notes from the year prior to the assessment.  For over a year prior to this assessment, both Dr. Martin and a consultative psychologist assessed Plaintiff as having GAF

scores which reflected only mild or transient/slight symptoms (i.e., 7/06-Tr. 317; 8/06-Tr. 316; 9/06-Tr. 314; 11/16-Tr. 326, 353; 12/06-Tr.351). In January, February, March, and May 2007, Dr. Martin assessed no changes in Plaintiff's GAF scores (Tr. 344-49, 358-59). Consistent with his good clinical findings, in May and June 2007, Plaintiff reported that he felt "good" on his current medication regimen (Tr. 358, 378). Furthermore, in July 2007, Plaintiff reported that his job concentration was better with the 150 mg. dosage of Wellbutrin (Tr. 376).

In addition, one month after his reported escalation in symptoms, in November 2007, Dr. Martin noted his improvement, but questioned whether he was really homeless (Tr. 369). Four months later, he indicated he was using marijuana, alcohol, and pain killers (Tr. 427), but successfully completed a 12 week program to regain his sobriety (Tr. 408-33). His condition continued to improve thereafter (Tr. 392-93); he was in a state program (from at least August 2008 through February 2009) where while working, a significant portion of his housing would be paid (Tr. 441-508). Furthermore, in August 2009, Dr. Martin noted that Plaintiff denied being depressed and that he had no worsening in his condition, just as she had noted one month prior (Tr. 573-76). Hence, this evidence shows that there was not a 12 month continuous period where Plaintiff had "severe: symptoms of mental illness. *See*, 20C.F.R. Sections 404.1505; 416.905 (in order to prove disability, a claimant must prove he or she had disabling limitation(s) for at least a continuous 12 months) (emphasis added).

Thereafter, in light of Plaintiff's improved condition, Dr. Martin completed a much improved assessment of Plaintiff's functioning, where she rated Plaintiff as having a fair ability to function in 19 work-related mental functioning areas, but that he had a poor or no ability to basically sustain a normal workday or workweek without unreasonable interruptions (Tr. 405-06). For the same reasons the medical expert found Plaintiff not credible, the ALJ also found that Dr. Martin's sustainability limitation was not supported by the record. The medical expert correctly stated that while Plaintiff had the sustainability to work and play on his computer for extended periods (i.e., 14-18 hours), it was reasonable that he would be able to do the same in another area (i.e., work) (Tr. 26). The medical expert agreed that Dr. Martin was a very credible psychiatrist and very alert to bipolar disorder; however, in light of the evidence of record, the medical expert still found Plaintiff not

credible and did not agree with Dr. Martin's diagnosis of bipolar disorder (Tr. 35, 39). The medical expert could not ignore Plaintiff's inconsistencies in the record and his demonstrated ability to use his computer/internet for hours at a time.

Plaintiff also fails to mention the opinions of two other medical sources who found that his mental impairments were not severe, namely the state agency reviewing psychologists Drs. Melvin and Lewin (Tr. 329, 355). He also does not mention the consultative psychologist Dr. Pickholtz and his mostly normal findings (i.e, mild depression at worst, 'no difficulties' in functioning appropriately, GAF of 70-mild symptoms) (Tr. 321-27). In light of substantial evidence in the record regarding Plaintiff's functioning, the ALJ correctly concluded that Plaintiff's personality disorder and substance abuse, in remission, were not "severe" impairments, as they did not significantly limit his ability to perform basic work activities for at least a consecutive twelve-month period (Tr. 10-11). *See* 20 C.F.R. Section 404.1520(c).

### VIII. CONCLUSION

Based upon a review of the record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff was not disabled because his medically determinable impairments were not severe and they did not significantly limit his ability to perform work for at least twelve consecutive months.

DATE: June 28, 2011
*/s/George J. Limbert*
GEORGE J. LIMBERT
UNITED STATES MAGISTRATE JUDGE